# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| VOTEVETS ACTION FUND; DEMOCRATIC NATIONAL COMMITTEE; and DSCC a/k/a DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE, | Case No. 4:18-cv-00524-WS-CAS |
| Plaintiffs, | |
| v. | |
| KENNETH DETZNER, in his official capacity as the Florida Secretary of State, | |
| Defendant. | |

**INTERVENOR-DEFENDANT NATIONAL REPUBLICAN SENATORIAL COMMITTEE'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY INJUNCTION, TEMPORARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

ARGUMENT ...........................................................................................2

I.     Plaintiffs cannot obtain an emergency injunction to challenge decades-old Florida statutes.............................................................3

II.    Plaintiffs cannot show likelihood of success on the merits because Florida's deadline does not violate the Constitution. ......................5

      A.    Florida's statutory deadline has been upheld as reasonable and nondiscriminatory....................................................................5

      B.    Every election has deadlines and clear deadlines are constitutional—they pose minimal burdens on the vote while supporting important state regulatory interests. ...................7

            1.    Florida's deadline imposes a minimal burden on voters. ...........7

            2.    Florida's deadline serves important state regulatory interests. ...................................................................11

      C.    If Florida's mailed ballot deadline is unconstitutional, so are the laws of many other states. ................................................15

      D.    The case law Plaintiffs cite does not help them. ................................18

III.    Plaintiffs cannot show irreparable injury.....................................................21

IV.    Equities and the public interest favor no preliminary injunction here. .........23

CONCLUSION ...........................................................................................24

**INTRODUCTION**

Plaintiffs ask this federal Court to enjoin, on an emergency basis, the operation of Florida election law that has been clearly established for decades. They are not challenging the law as applied in some unique, specific circumstance—instead, they mount an outright facial constitutional challenge. But this law was challenged on the same grounds and upheld as constitutional fourteen years ago. *See Friedman v. Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004).

Now, *after* a close election leaves them short, Plaintiffs claim that an ordinary, politically neutral, common-sense state law deadline—that domestic vote-by-mail ballots must be received by the supervisors of elections by 7 p.m. on Election Day—violates the federal Constitution. The gist of their grounds for this is that the U.S. Postal Service is slower than some people think it is and that anyone who makes some effort to mail in a vote by Election Day should have it counted.

Plaintiffs' sought injunction is staggering in its scope. It does not target any one county, nor does it cite any unique circumstance to justify injunctive relief. Instead, it aims at all 67 of Florida's counties. And the argument that Plaintiffs offer in support would strike down election deadlines in many other states—including both Georgia and Alabama in this Circuit alone.

The challenged statute is constitutional on its face. State legislatures have the expressly delegated constitutional power to regulate the "Time, Place, and Manner" of senatorial elections. U.S. Const. Art. I, § 4, cl. 1. Setting election deadlines is a most basic and plain function of this Constitutional requirement. The provision that sets this 7 p.m. deadline is no different than provisions that set the times polls open and close, or impose deadlines for voter registration. The Supreme Court has recognized that when such provisions are "reasonable, nondiscriminatory restrictions," courts should readily uphold them. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

Plaintiffs thus face multiple independent and steep standards—the (difficult) standard for preliminarily enjoining any state legislation, the (difficult) standard for enjoining election officials *after* an election, and the (difficult) standard for showing that an ordinary and common election deadline is unconstitutional. Plaintiff cannot surmount any, much less all, of these barriers. This Court should deny Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

Courts highly disfavor preliminary injunctions like the one Plaintiffs seek here. "Preliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a

full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution." *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994).

## I. Plaintiffs cannot obtain an emergency injunction against decades-old Florida statutes.

"[I]n election law cases as elsewhere," a party requesting preliminary injunctive relief "must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam). The doctrine of laches enforces this requirement, barring a claim when "(1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the delay caused [an opposing party] undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). Laches applies with particular force in election cases: "Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented." *Sw. Voter Registration Educ. Proj. v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003).

Here, Plaintiffs waited until *after the election* to sue even though the 7 p.m. Election Day deadline has been law for decades. *See* Fla. Stat. § 101.67 (requiring receipt by 7 p.m. on Election Day since 1971); Fla. Stat. § 101.6103(2) (requiring electors to get their mail ballots in by 7 p.m. on Election Day since 1988).

As a matter of well-established precedent, this delay forecloses a preliminary injunction. "[T]he law imposes the duty" to bring election grievances forward "for *pre-election* adjudication." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973) (emphasis added). A contrary rule would "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.*; *see also Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988) (collecting cases showing that courts do not generally forgive delays in the election context "lest the granting of post-election relief encourage sandbagging").

Plaintiffs have no legitimate justification for their delay. Their strategic timing prejudices the Secretary and election officials. Plaintiffs have also prejudiced Intervenor-Defendants and voting members of the public, who conducted themselves in accordance with the existing regime and now face the potential confusion of after-the-fact, retroactive changes to longstanding election laws. *See Fishman v. Schaffer*, 429 U.S. 1325, 1330 (1976) ("[A]n injunction at this time would have a chaotic and disruptive effect upon the electoral process."). Indeed, the Republican Party has explained how it organized its efforts to ensure voters complied with the deadline. Dkt. 43 at ¶ 5 ("voters were specifically

instructed NOT to place their ballots in the mail, given the proximity of Election Day").

"Timing is everything." *United States v. Heard*, No. 18-10479, 2018 WL 4181736, at *3 (11th Cir. Aug. 30, 2018). Plaintiffs' tactical decision to hold their lawsuit in reserve until *after* initial returns showed them losing the United States Senate election and the Governor's race bars a preliminary injunction.

## II. Plaintiffs cannot show likelihood of success on the merits because Florida's deadline does not violate the Constitution.

Even if the Court reaches this injunction element now, which it need not, Plaintiffs are unlikely to prevail on their argument that Florida's statutory deadline violates the Constitution.

### A. Florida's statutory deadline has been upheld as reasonable and nondiscriminatory.

Plaintiffs argue that Florida's statutory deadline denies people their right to vote and so is a "severe" restriction subject to strict scrutiny. Dkt. 4-1, at 9-10. Plaintiffs are wrong on all counts. To be clear, the Florida law challenged here simply sets a deadline: the supervisor of elections must receive mailed ballots by 7 p.m. on Election Day.

Every election law, from registration to identification to polling-place hours, burdens voters in some sense. But the Constitution specifically instructs states to control "[t]he Times, Places and Manner of holding Elections for Senators." Art. I,

§ 4, cl. 1. "There must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

The governing rule is that "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434.

Florida's deadline is precisely the sort of "reasonable, politically neutral regulation" that the Supreme Court has "repeatedly upheld." *Burdick*, 504 U.S. at 438; *id.* (adding that "reasonable regulation of elections . . . *does* require [voters] to act in a timely fashion if they wish to express their views in the voting booth").

In fact, fourteen years ago the exact statute at issue here did survive a constitutional challenge that was initially filed on election day 2004. In *Friedman v. Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004), the court rejected a challenge indistinguishable from the one here, and refused a preliminary injunction. The court ruled specifically that Fla. Stat. § 101.67(2)'s same-day deadline "does not amount to a violation of [voters'] First and Fourteenth Amendment rights," nor does it violate Equal Protection. *Id.* at 1373, 1380. The court observed that "§ 101.67(2) does not deny the right to vote to a class of persons. It merely imposes a

deadline … [it] pr[e]scribes the mechanics of voting by absentee voters in Florida." *Id.* at 1376.

Thus, the court ruled, the law "is subject to a lesser standard of review under *Burdick.*" *Id.* Applying that "lesser standard," the court held that "the State's interests in ensuring a fair and honest election and to count votes within a reasonable time justifies the light imposition on Plaintiffs' right to vote." *Id.* at 1377. *Friedman* was correct in 2004 and it is correct today. Plaintiffs ignore it.

**B. Every election has deadlines and clear deadlines are constitutional— they pose minimal burdens on the vote while supporting important state regulatory interests.**

The heart of Plaintiffs' claim is that the U.S. Postal Service may take an uncertain number of days to deliver a ballot, so some voters may miss the deadline through no fault of their own. Plaintiffs incorrectly infer that this circumstance creates a constitutional failing in the deadline.

**1. Florida's deadline imposes a minimal burden on voters.**

Neutral deadlines do not impose severe burdens on the right to vote. Every state has cut-offs. *Rosario v. Rockefeller*, 410 U.S. 752, 760 (1973) (upholding a "reasonable cutoff point for [voter] registration" set months ahead of the primaries); *Chelsea Colllaborative, Inc. v. Secretary of Commonwealth*, 100 N.E.2d 326, 333-36 (Mass. 2018) (holding that a voter registration deadline did not

create "a substantial enough interference with the right to vote to justify . . . strict scrutiny, and upholding the deadline under rational basis review).

Wherever the state sets a deadline, some people will miss it. For instance, the polls in Florida are open from 7 a.m. to 7 p.m. Fla. Stat. § 100.011(1). Some number of intended voters will always wake up too sick to venture out on election day, or have car trouble on the way to the polls and fail to make it, or simply arrive at the polling station too late for any number of reasons beyond their control. None of these situations convert the deadline into a severe burden on the right to vote.

No one here suggests that the statutory poll-closing time of 7 p.m. violates the Constitution—yet that is the undeniable import of Plaintiffs' argument. A voter who mails his ballot just a day or two ahead of the election is no different from a voter who leaves his house at 6:45 p.m. to head to the polls. If there is traffic, or other misfortune, he may not make it. So long as the rules are clear, and announced in advance, they place no constitutionally suspect burden on the right to vote.

The bottom line is, the statutes reasonably place the responsibility on the voter to make sure their ballot reaches election officials by Election Day when they choose to exercise the vote by mail option the state has made available to them. The "statute for absentee voting explicitly places the burden on *the voter* (not the

USPS) to deliver the ballot no later than 7:00 p.m. on election day." *Goldsmith v. McDonald*, 32 So.3d 713, 715 (Fla. 4th D.C.A. 2010). A voter may "personally convey[] the ballot or rely[] on others (such as the USPS) to do so." *Id.* (rejecting the argument that mailing a ballot before Election Day should suffice as substantial compliance with the deadline).

This sort of burden is normal and not properly viewed as a severe limit on the right to vote. *E.g., Crawford v. Marion County Election Board*, 553 U.S. 181, 198 (2009) (upholding a voter ID requirement, noting that "the inconvenience of making a trip to the [bureau of motor vehicles], gathering the required documents, and posing for a photograph, surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting"); *Fla. State Conference of N.A.A.C.P. v. Browning*, 569 F. Supp. 2d 1237, 1253 (N.D. Fla. 2008) (holding that "these burdens—to drive to an elections office or send a piece of mail—are not constitutionally cognizable impediments to the right to vote"); *Gustafson v. Illinois State Bd. of Elections*, 2007 U.S. Dist. LEXIS 75209, at *30 (N.D. Ill. Sept. 28, 2007) (noting that a law allowing and regulating absentee balloting "does not remove the right to vote from any individual [but] indeed expands the right").

This deadline, in particular, is not onerous on voters. The 7 p.m.-on-Election-Day rule has been the same for decades. It is also widely publicized. For

instance, Broward County's election website states, in bold red type, "Voted Vote By Mail ballots must be received by the Supervisor of Election's office no later than 7:00 PM on Election Day."[1]  Other county websites, and the state Division of Elections website, include similar information.[2]

Similarly, state law requires the instructions sent with each vote by mail ballot to say: "VERY IMPORTANT. In order to ensure that your vote-by-mail ballot will be counted, it should be completed and returned as soon as possible so that it can reach the supervisor of elections of the county in which your precinct is located no later than 7 p.m. on the day of the election."  Fla. Stat. § 101.65.

During the weeks before Election Day, state law provides that voters by mail can go online and confirm individually whether the supervisor of elections received their ballot.  Fla. Stat. § 101.62 (requiring supervisors to daily update information about votes by mail received, provide it "in electronic format," and make it available "to the voter requesting the ballot").  In fact, supervisors must *tell* voters who request vote-by-mail ballots about the "free access system . . . for determining the status of his or her vote-by-mail ballot."  Fla. Stat. § 101.62(c).  A

---

[1]   https://www.browardsoe.org/Voting-Methods/Vote-By-Mail-Voting/Absentee-Ballot-and-Early-Voting-Instructions.

[2]   *See, e.g.,* Palm Beach County, https://www.pbcelections.org/content.aspx?id=30; Hillsborough County, https://www.votehillsborough.org/About-Voting/Three-Ways-to-Vote/Vote-By-Mail; Florida Div. of Elections, https://dos.myflorida.com/elections/for-voters/voting/vote-by-mail/.

voter whose ballot does not arrive can thus know that through minimal diligence. The voter then has other options to ensure her vote is counted. Fla. Stat. § 101.69 ("The provisions of this Code shall not be construed to prohibit any elector from voting in person . . . notwithstanding that the elector has requested a vote-by-mail ballot.").

Given all this, it makes sense that more than 2.6 million Florida voters in 2016 managed to get their mailed ballots in on time, and fewer than 6,400 did not. Dkt. 34 at ¶ 5. Fewer than 1 in 430 of the voters who chose to use the mail to vote in the last federal election saw their ballots rejected as untimely. *Id.*[3]

Florida law gives every person who sends in a vote by mail ballot ample opportunity to cast a valid ballot under the law and to ensure his or her ballot is counted. Even Plaintiffs' own declarant Kirk Nielsen shows how light this burden is. Dkt. 27. Mr. Nielsen says he mailed his ballot on October 29 and that he knew how to check the Miami-Dade elections website to see when his ballot arrived. Dkt. 27 at ¶¶ 4-6. He then admits that he *did* check and saw the supervisor had not

---

[3] It has been suggested that the low numbers of late ballots would not present a significant burden on supervisors to count in the ten days after the election. Dkt. 31 at ¶ 18. But if the same-day deadline is unconstitutional, then voters in the future will be able to postmark on election day—which means millions of votes would be arriving two, three, four, five days after the election. This would undoubtedly create a tremendous burden and make it impossible to quickly determine who won an election. *Dem. Exec. Comm. v. Detzner,* No. 4:18-cv-520, Order, Dkt. 46 at 25 (N.D. Fla. Nov. 15, 2018) (recognizing that a quick reporting of election results is a "compelling interest").

received his ballot, "considered going to my polling place to cast a provisional ballot in person," but ultimately decided not to, assuming a computer error or delay. Dkt. 27 at ¶ 6. That circumstance cannot describe a 'severe burden' on the right to vote.

### 2. Florida's deadline serves important state regulatory interests.

The deadline of 7 p.m. on Election Day also advances important state regulatory interests. *Burdick*, 504 U.S. at 438. Election officials could not fulfill their statutory duties without the imposition of voting deadlines. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("[I]t is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.").

Even Plaintiffs seem to concede that a deadline is necessary—they just think it should be a different deadline than the one the legislature adopted decades ago. "When evaluating a neutral, nondiscriminatory regulation of voting procedure, [courts] must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Crawford*, 553 U.S. at 203.

Here, the statutory scheme favors voters sending in their mail ballots early. This eases the load on election officials on and immediately after Election Day, as they proceed through the post-election canvas, recount, and certification process.

The scheme achieves this reasonable regulatory purpose first by placing the burden of delivery on the voter, not the U.S. Postal Service. *Goldsmith*, 32 So.3d at 715.

Next, the statutes call for canvassing boards to "upload . . . by 7 p.m. on the day *before* the election the results of all early voting and vote-by-mail ballots" received during the early voting period. Fla. Stat. § 102.141(4)(a) (emphasis added). This favors the "orderly administration" of elections, *Crawford*, 553 U.S. at 196, and should remove most of the election-day counting efforts for vote by mail. Finally, the statutes require "all tabulated vote-by-mail results" to go to the Department of State "within 30 minutes after the polls close," and updated every 45 minutes "until all results are completely reported." Fla. Stat. § 102.141(4)(b). Given the effort involved in digesting and counting mailed ballots, Florida's statutory structure draws deadlines that both encourage and rely on early mailing of those votes.

Millions of Floridians now vote by mail, as Plaintiffs point out. Dkt. 4-1, at 3-4 (citing 3.5 million mail ballot requests in the 2018 election). The state has a strong regulatory interest in processing those ballots largely *ahead* of Election Day, not in an amorphous string of days after, while supervisors are consumed with other duties. The people reasonably expect, and are entitled to, at least a strong idea of who won their elections on the evening of Election Day, not weeks later. The Florida legislature acted well within its constitutional authority to

determine that counting up to millions of votes that arrive more than a week after Election Day would undermine "public confidence in the integrity of the electoral process." *Crawford*, 553 U.S. at 197.

In the context of such a "reasonable" restriction on the rights of voters, "the State's important regulatory interests are generally sufficient." *Burdick*, 504 U.S. at 434.

Plaintiffs point out that Florida ballots from overseas can be counted if postmarked by Election Day and received up to ten days later. Fla. Stat. § 101.6952(5). But this provision is a narrow and reasonable exception to the general rule. It exists as a "federally mandated exception to § 101.67(2) designed to render Florida's entire absentee ballot counting procedure in compliance with federal law." *Friedman*, 345 F. Supp. 2d at 1376 n.17 (detailing the history of this); *see also Harris v. Fla. Elections Comm'n*, 235 F.3d 578, 580 n.4 (11th Cir. 2000) (quoting the Florida Supreme Court: "Our statutory scheme has been superseded by federal law governing overseas voters").

In short, the Overseas Citizens Voting Rights Act and the Federal Voting Assistance Act demanded different treatment for overseas voters, preempting the state law. Florida accepted judicial intervention in 1980 and 1982, created an administrative rule in 1984, then ultimately ensconced the ten-day exception into its own statutes in 2001.

The history of the ten-day rule for overseas voters shows that it is a narrow exception to Florida's nearly fifty-year old vote by mail deadline. This exception exists to permit overseas voters to have the same opportunity to cast their vote as local by-mail voters, whose ballots must arrive by Election Day. And by comparison to domestic mail voters, the number of overseas voters is scant. In 2016, Florida saw 33 times as many domestic mail ballots returned as overseas ballots (2.68 million domestic ballots versus 81,167 overseas ones). Dkt. 34 at ¶ 5. In 2014 the differential was 72:1 (1.87 million domestic; 25,857 overseas).[4]

Neither the rule nor the exception casts constitutional doubt on the other. *E.g., Harris*, 235 F.3d at 580 (refusing to "nullify" the ten-day exception); *Harris v. Fla. Election Canvassing Comm'n*, 122 F. Supp. 2d 1317 (N.D. Fla. 2000) (effectively accepting both rules, with the ten-day exception being required by federal law); *Friedman*, 345 F. Supp. 2d at 1376 (refusing to use the ten-day exception to cast constitutional doubt on the same-day deadline for domestic vote-by-mail ballots).

### C. If Florida's mailed ballot deadline is unconstitutional, so are the laws of many other states.

The scope of Plaintiffs' argument is staggering. Nothing in Plaintiffs' argument confines its reach to Florida or relies on Florida-specific facts. Enjoining this

---

[4] Florida Department of State, Report by the Military and Overseas Voting Assistance Task Force to the Governor, President of the Florida Senate, and the Speaker of the House, at 27 (June 2017).

statute on the grounds Plaintiffs proffer would cover, just the same, many other jurisdictions.

First, many other states that permit no-excuse absentee voting *also* require that (at least domestic) ballots arrive by the time polls close on Election Day. *E.g.,* Ariz. Rev. Stat. § 16-548 (ballots must be received no later than 7 p.m. on election day); Ga. Code § 21-2-386(a)(1)(F) (absentee ballots not received before close of polls on election day not counted); Hawaii Rev. Stat. § 15-9(a) (absentee ballots must be received by close of polls on election day); Minn. Stat. § 203B.08(3) (absentee ballots must be received before 3 p.m. if delivered in person or 8 p.m. if delivered by mail); Nev. Rev. Stat. Ann. §§ 293.316(6), 293.317 (absentee ballots must be returned no later than the time the polls close on election day); N.J. Stat. § 19:63-18 (mail-in ballots counted if received before close of polls); Vermont Stat. § 2543 (absentee ballots counted only if returned before the close of polls on election day); Wisc. Stat. §6.87(6) (absentee ballots must arrive no later than 8 p.m. on election day).

For that matter, given that Plaintiffs seem to believe the Constitution calls for a 10-day extension, it is not clear why many of the state laws they tout survive constitutional scrutiny, either. *See* Dkt. 4-1 at 6 (listing 8 more states that allow fewer than ten days after Election Day for mailed ballots to arrive).

Still other states disallow voting by mail entirely except for narrow circumstances. For example, Virginia and New York permit voters to submit absentee ballots only if they certify that they meet certain specified circumstances. Va. Code §§ 24.2-700–701; N.Y. Elec. Law § 8-400. In the application, the voter must provide sworn detail about the reason for her absence. Va. Code §§ 24.2-701(C). The point is, many people who vote by mail in Florida *for convenience* simply could not do that *at all* in other states.

A number of states also, like Florida, have different deadlines that govern military and overseas mail ballots than domestic ones. For example, Georgia—which requires absentee ballots to arrive by poll closing time on election day—allows three extra days for overseas ballots postmarked by election day to arrive. Ga. Code § 21-2-386(a)(1)(F-G). Likewise, New York counts domestic absentee ballots postmarked before Election day and received up to 7 days afterwards, but allows overseas ballots 13 days to arrive. N.Y. Elec. Law § 8-412(1); § 10-114.

Last, some states are stricter than Florida both in who can vote absentee and their timing deadlines. Alabama, Mississippi, and Pennsylvania all require justification to obtain a domestic absentee ballot, plus impose an even stricter return deadline. *See* Code of Ala. §§ 17-11-3, 7; Miss. Code §§ 23-15-713–715; 25 Penn. Stat. § 3146.1. Absentee ballots in Alabama must be received by *noon* on Election Day. Code of Ala. §§ 17-11-18(a). In Mississippi, subject to some

exceptions, absentee ballots must be received by 5 p.m. on the day *before* Election Day.  Miss. Code § 23-15-637.  Pennsylvania has even more stringent requirements—domestic absentee ballots must be received no later than 5pm on the *Friday before* Election Day.  25 Penn. Stat. § 3146.8(a).

All three states also offer extensions to military and overseas voters.  Code of Ala. § 17-11-18(b) (authorizing counting of such ballots received 7 days after election); Miss. Code § 23-15-699(6) (ballots must be received by 7 p.m. on election day); 25 Penn. Stat. § 3146.8(g) (ballot must be postmarked before election day and received 7 days after election).

Plaintiffs try to make Florida's statutory deadline appear draconian.  Dkt. 4-1 at 6-7.  But in fact, in this Circuit alone Florida's rule parallels Georgia's and is more lenient than Alabama's.  The Supreme Court has warned against the exact bootstrapping Plaintiffs attempt here.  *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 810–11 (1969) ("Ironically, it is Illinois' willingness to go further than many States in extending the absentee voting privileges . . . that has provided appellants with a basis for arguing that the provisions operate in an invidiously discriminatory fashion to deny them a more convenient method of exercising the franchise.").

### D. The case law Plaintiffs cite does not help them.

Plaintiffs cite a handful of cases in which courts have extended statutory voting deadlines. These cases typically involve at least one of two key circumstances: (1) the order was a remedy—sometimes an agreed remedy—for a statutory violation committed by the government; and (2) unforeseen and significant events, often acts of God, that dramatically affected tiny numbers of ballots or small geographic areas (nothing close to a whole state). Neither of those circumstances exist here.

Most prominently, Plaintiffs cite *Democratic Party v. Burkes*, No. 1:18-cv-212, Consent Order, Dkt. 5 (M.D. Ga. Nov. 9, 2018). Pltfs' Memo., Dkt. 4-1, at 7. In *Burkes,* the court granted a consent judgment allowing late-arrived mail-in ballots from a single rural county in Georgia. The Court observed that "a confluence of extraordinary circumstances" had occurred. Consent Order at 1. Because of an unrelated judicial injunction, the Columbus Day holiday, and then the devastation of Hurricane Michael, the county clerk had failed to *send out* requested mail ballots until just before the election, more than a month after Georgia's statutory deadline. The Court thus allowed the counting of votes that arrived up to three days late. The Order is best seen as an agreed remedy for one county clerk's (unique, justifiable) statutory violation.

Other cases Plaintiffs rely on similarly turned on statutory violations or clear errors by election officials. *See, e.g., United States v. Florida*, 1982 U.S. Dist. LEXIS 18487 (N.D. Fla. Apr. 2, 1982) (granting ten extra days as a remedy for the

state's violation of the federal Overseas Citizens Voting Rights Act, 42 U.S.C. § 1973dd, because state primary schedules made it near impossible to receive overseas ballots in time); *Stamos v. Genesee County Bd. of Canvassers*, 46 Mich. App. 636, 645 (1973) (ordering the counting of 22 absentee ballots in possession of election officials by closing time on Election Day but that had not reached their correct precincts, calling this "an election official's failure to comply with statutory provisions"); *Brown v. Grzeskowiak*, 101 N.E.2d 639, 654 (Ind. 1951) (ordering the counting of 46 ballots timely returned to the clerk's office, but which did not reach their precincts "because of the failure of the county clerk or any other election official to do his duty").

Finally, *Georgia Coalition for People's Agenda v. Deal*, 214 F. Supp. 3d 1344 (S.D. Ga. 2016), relied on an act of God—Hurricane Matthew—to extend the voter registration filing deadline in one Georgia county.

None of these cases are like this one. The challenge Plaintiffs bring asserts that Florida's statutory deadline categorically violates the First and Fourteenth Amendments. Plaintiffs cite no act of God and no prior government violations of federal or state election law that need redressing. Instead, they say U.S. mail is sometimes slow. They cite a bomb scare two weeks before the election at one mail facility as an example of an event that *could* slow down mail, but they do not even allege, much less offer any evidence, that any delay in the return of any ballots by

the United States Postal Service actually occurred. On the contrary, the U.S. Postal Service has said that "the recent incidents of suspicious packages had no impact on operations or on acceptance and tendering of ballots to election officials." M. Vassolo, "U.S. Postal Service investigates ballots mailed through Opa-locka facility," *Miami Herald*, Nov. 9, 2018.[5]

Similarly, Ion Sancho's declaration—describing hurricanes in 2016, 2005, and 2004—only further reveals the absence of unique circumstances here. Dkt. 31 at ¶ 10. Mr. Sancho also recites procedures he undertook as a supervisor of elections to gather all proper votes by 7 p.m., including using green envelopes and going to mail facilities himself on Election Day to "find what mail was ours." *Id.* at ¶ 15-17.

Even when unique and extreme circumstances (entirely un-alleged and un-proven in this case) arise, the proper redress is narrow and targeted—not striking down the entire law. *See Fla. Democratic Party v. Detzner*, No. 4:18-cv-463, at 2 (N.D. Fla. Oct. 10, 2018) (Hinkle, J.) (refusing to grant a state-wide extension of time after Hurricane Michael, observing that the Secretary's voluntary extensions of a deadline just in counties where election offices had closed was adequate).

### III.    Plaintiffs cannot show irreparable injury.

---

[5] https://www.miamiherald.com/news/politics-government/election/article221442850.html.

"A showing of irreparable injury is the sine qua non of injunctive relief."

*Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Thus, "even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Id.*

Plaintiffs argue that they will suffer irreparable injury unless this Court immediately enjoins Florida election officials from following Florida's long and clearly established law. That is not the case.

Given how long this statute has existed—and the fact that it was challenged on the same grounds here and upheld fourteen years ago—Plaintiffs have no good reason for a preliminary injunction now. The law is clear "that a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016); *see also Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (Plaintiffs' claim of "a serious injury bec[a]me less credible by their having slept on their rights.").

Plaintiffs also have other adequate remedies, negating irreparable injury. *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1127 (11th Cir. 2005) ("However, because [an injunction] is an extraordinary remedy, it is available not simply when the legal right asserted has been infringed, but only when that legal

right has been infringed by an injury for which there is no adequate legal remedy and which will result in irreparable injury if the injunction does not issue."). Florida law provides a process by which "any elector qualified to vote in the election" may contest the certification of election results. Fla. Stat. § 102.168(1). The law specifically provides a mechanism to contest an election based on "[r]eceipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election." *Id.* § 102.168(3)(c).

Rather than enjoin the operation of a facially neutral state law supported by legitimate state interests, this Court should recognize that Plaintiffs may challenge the rejection of the ballots at issue here through the statutorily directed procedure set forth in Fla. Stat. § 102.168.

## IV. Equities and the public interest favor no preliminary injunction here.

The public interest and balance of harms militate strongly against the post-Election Day, statewide injunctive relief sought by the Plaintiffs because of the hugely disruptive consequences such an order would carry. Even when faced with a request to enjoin election procedures "weeks before" an election, a court must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to elections cases." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). For example, "[c]ourt orders affecting elections . . . can

themselves result in voter confusion." *Id.* Even "seemingly innocent alterations in election rules" can result in "danger[ous] unanticipated consequences." *Griffin v. Roupas*, 385 F.3d 1128, 1132 (7th Cir. 2004).

For these reasons, courts overwhelmingly seek to avoid interfering with voting laws even in the weeks *leading up to* an election. *See, e.g.*, *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012) ("As a general rule, last-minute injunctions changing election procedures are strongly disfavored."). Changing the law shortly before an election is bad enough; changing the law *after* the election is even worse.

Relatedly, the "balance of equities and the public interest tilt[] against" Plaintiffs because they "could have sought [preliminary relief] much earlier." *Benisek*, 138 S. Ct. at 1944. As discussed above, there is no reason this lawsuit could not have been filed months (or even years) before the present election cycle. If Plaintiffs believed that Florida's statutory deadline was a constitutional violation, they had every opportunity to bring their claims long ago, rather than wait until after Election Day. The Court should not reward their decision to "seek to undo the ballot results in a court action" when things did not go their way on Election Day. *Toney*, 488 F.2d at 314. This is not a case where the key facts or law has arisen "at a late hour." *Id.*

# CONCLUSION

The Court should decline to issue a preliminary injunction.

## LOCAL RULE 7.1(F) CERTIFICATION

The undersigned certifies that the attached memorandum of law contains 5,830 words.

Respectfully submitted,

*/s/ Andy Bardos*

John D. Adams*
Matthew A. Fitzgerald*
MCGUIREWOODS LLP
800 East Canal Street
Richmond, Virginia 23219
Telephone: 804-775-4744
jadams@mcguirewoods.com
mfitzgerald@mcguirewoods.com
* *pro hac vice*

Andy Bardos (FBN 822671)
George T. Levesque (FBN 555541)
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida 32302-3189
Telephone: 850-577-9090
andy.bardos@gray-robinson.com
george.levesque@gray-robinson.com

Jason Torchinsky (VA Bar No. 47481)
Holtzman Vogel Josefiak Torchinsky PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20106
Telephone: (540) 341-8808
JTorchinsky@hvjt.law

*Attorneys for the National Republican Senatorial Committee*